**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**HAL RIDGWAY,**

    **Plaintiff,**

**v.**                                                             **Case No. 8:09-CV-0728-T-30EAJ**

**STANDARD INSURANCE COMPANY,**

    **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

Before the court are Defendant's **Motion for Summary Judgment** (Dkt. 32), Plaintiff's **Memorandum of Law in Opposition** (Dkt. 41), and Defendant's **Reply** (Dkt. 44); and Plaintiff's **Dispositive Motion for Summary Judgment** (Dkt. 47) and Defendant's **Memorandum of Law in Opposition** (Dkt. 49).[1]

Plaintiff brings suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., claiming Defendant improperly denied Plaintiff's request for long term disability benefits. Each party seeks summary judgment as to whether Defendant's denial of benefits was wrong and, if so, was arbitrary and capricious.

**Statement of Facts**

**I.**       **Background**

Plaintiff, a dermatologist, was the president of Forest Hill Dermatology Associates and a member of its long term disability plan ("the Plan"). (R 1-29, 451) The Plan defined disability as the inability to perform, with reasonable continuity, work involving "essential tasks, functions and

_____

[1] The motions have been referred to the undersigned for a Report and Recommendation. See 28 U.S.C. § 636(b); Local Rules 6.01(b) and (c), M.D. Fla.

operations" of the same general character as those regularly performed by the member when the disability began. (R 11-12) The Plan covered only disabilities resulting from physical disease, injury, pregnancy, or mental disorder; benefits were not available to those merely deprived of the "right" to perform an occupation, "including a restriction or loss of license." (Id.)

Arrested for driving under the influence in February 2004, Plaintiff was briefly incarcerated and admitted to Challenges, a rehabilitation facility, where he remained through August 25, 2004. (R 311) Plaintiff applied for benefits under the Plan, claiming disability due to alcoholism relapse and bipolar disorder. (R 259) Defendant concluded that Plaintiff was entitled to benefits for the period commencing ninety-days after Plaintiff's admission to Challenges and ending upon Plaintiff's discharge.[2] (R 197, 339) Plaintiff requested review of this decision, claiming entitlement to benefits from August 25, 2004 through January 3, 2005, when he returned to work. (R 189) Plaintiff further sought to reopen his claim beginning January 25, 2005, when he again ceased working. (Id.)

After reviewing Plaintiff's claim file, Defendant again concluded that Plaintiff was not entitled to disability benefits after August 25, 2004. (R 105) This conclusion was reaffirmed following a subsequent review by Defendant's Quality Assurance Unit ("QAU"), which found "insufficient evidence" that Plaintiff was unable to perform the material duties of his occupation following his discharge from Challenges. (R 85) Defendant reasoned that Plaintiff's inability to work was an administrative issue that did not entitle him to benefits under the Plan. (R 87)

Although Defendant indicated that its decision was final, it advised that it had attempted to

---

[2] The Plan provided that benefits would not become payable until a member had been continuously disabled for ninety days. (R 6, 27)

retrieve medical records from certain providers but was unsuccessful. (R 87)  Defendant invited Plaintiff to submit these records and stated that if Plaintiff did so within thirty days, his claim would be reconsidered. (R 87-88)  Plaintiff, however, did not timely submit additional records.[3] (R 64)

## II.     The Administrative Claims File Evidence

Shortly after Plaintiff's February 2004 admission to Challenges, Dean J. Rotondo, M.D. ("Dr. Rotondo"), a psychiatrist, diagnosed Plaintiff with alcohol dependence and bipolar disorder (not otherwise specified) and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50. (R 342)  In July 2004, Plaintiff's prognosis was "good" subject to "absolute abstinence" and compliance with psychiatric recommendations. (T 351)  Dr. Rotondo subsequently indicated that Plaintiff should have stopped working on February 19, 2004, the day after he was admitted to Challenges, and would be unable to work for an unknown period of time due to alcoholism, bipolar disorder, and functional limitations including hyperactivity, insomnia, flight of ideas, depression, and chronic diarrhea; however, Plaintiff's condition had improved and was expected to further improve. (R 377)  On August 30, 2004, five days after Plaintiff's discharge, Dr. Rotondo assigned Plaintiff a GAF score of 80. (T 354)

In a September 2004 Mood Disorder Questionnaire administered by Diana Fischer, M.D. ("Dr. Fischer"), Plaintiff indicated that he had serious problems resulting from his mood.[4] (R 321)

---

[3] Plaintiff notified Defendant that he was attempting to obtain the records at issue, however, he never submitted them to Defendant. (R 64)  More than two years after Defendant issued its final decision, Plaintiff's counsel informed Defendant that Plaintiff would be submitting additional records. (Id.)  Defendant responded that it would not consider the information because it had not been provided in a reasonable period of time relative to the final decision. (R 65)

[4] Although Plaintiff treated with Dr. Fischer prior to his admission to Challenges (R 327-35), Dr. Fischer's records from that period, when Plaintiff was working, do not reflect Plaintiff's functional abilities following his discharge from Challenges.

3

Plaintiff advised Dr. Fischer that he was "off work for another 3 months." (R 325)

The following month, Joan Martineau ("Martineau"), a licensed mental health counselor and certified addiction professional, described Plaintiff as distracted and resistant during one visit and angry and irritable on another occasion; Plaintiff was frustrated that he could not work. (R 308) The next month, Plaintiff again manifested disappointment that he had not obtained approval to resume working. (R 307) The following January, however, Martineau noted that Plaintiff had returned to work and traveled to South America to look at property. (R 306) Plaintiff indicated that his return to work made it difficult to travel to Martineau's office and visited Martineau for the last time one week later. (Id.)

In February and March 2005, Plaintiff saw Fred Prescitti ("Prescitti") at P.E.C., Inc. Outpatient Counsel Services.[5] (R 290-93) Prescitti noted that Plaintiff was taking Antabuse and drank alcohol during a weekend. (R 291)

On March 1, 2005, Defendant received a letter from Raymond M. Pomm, M.D. ("Dr. Pomm"), medical director of the Professionals Resource Network ("PRN"), a "statutorily mandated Impaired Practitioners Program, serving as the Consultant to the Department of Health and Board of Medicine on matters of substance abuse, psychiatric illness, behavioral issues, boundary violations and physical disability." (R 311) Dr. Pomm advised that Plaintiff had participated in PRN since 1992, secondary to diagnoses of bipolar disorder and alcohol dependence. (Id.) PRN "withdrew" Plaintiff from practice following his February 2004 arrest for driving under the influence, allowed him to return to work in January 2005, and again "withdrew" him from practice approximately three weeks later. (Id.) Dr. Pomm advised that Plaintiff was "executing a new

---

[5] The record does not document Prescitti's title or credentials.

contract with PRN," would continue to obtain treatment, and would "not be returned to work" before February 2007. (Id.)

Two days later, Plaintiff advised Defendant that, although his license had not been suspended, he was not seeing patients. (R 166) The Florida Department of Health Website confirmed that Plaintiff's license was active at that time. (R 183)

Later that month, Marvin Friedman, Pharm.D. ("Dr. Friedman"), a pharmacologist and certified addiction professional, reported treating Plaintiff for one-and-one-half years in group sessions. (R 288) Dr. Friedman stated that Plaintiff was unable to practice medicine due to "a prolonged period" of active alcohol dependency and "as a result of treatment and a continuing impaired state ... should be considered as disabled until such time that he is deemed in remission and safe to practice." (Id.)

In April 2008, PRN advised Defendant's record retrieval service that Plaintiff was no longer a participant and that PRN would have to speak with Plaintiff before releasing his records. (R 138) Defendant asked Plaintiff to contact PRN to facilitate release of the records to Defendant. (Id.)

At Defendant's request, Esther Gwinnell, M.D. ("Dr. Gwinnell"), a Board-certified psychiatrist, reviewed Plaintiff's file, including treatment records and correspondence from Dr. Rotondo, Dr. Pomm, Martineau, and Prescitti. (T 276-78) Dr. Gwinnell found no explanation why Plaintiff was unable to return to work after his discharge from Challenges. (R 277) Based on Dr. Pomm's statement that Plaintiff was executing a new contract with PRN, Dr. Gwinnell surmised that Plaintiff had experienced a relapse of his alcohol abuse; however, she noted a lack of information as to why Plaintiff executed the new contract. (Id.) Reasoning that Plaintiff could not consume alcohol while taking Antabuse, Dr. Gwinnell concluded that Plaintiff was unable to practice

medicine solely due to administrative or legal issues. (R 278) One week later, after reviewing Dr. Friedman's letter, Dr. Gwinnell reaffirmed that licensing difficulties, not illness, were the cause of Plaintiff's inability to work. (R 274)

Defendant later asked Steven Beeson, M.D. ("Dr. Beeson"), a Board-certified internist, to review Plaintiff's file. (R 267-68) Like Dr. Gwinnell, Dr. Beeson inferred that Plaintiff's execution of a new contract with PRN reflected a relapse of his alcohol abuse. (Id.) Nonetheless, Dr. Beeson found it "unclear" why Dr. Pomm deemed Plaintiff unable to work and noted Dr. Friedman's failure to explain why Plaintiff was disabled or to supply treatment notes substantiating or corroborating this conclusion. (R 268) Dr. Beeson also opined that Plaintiff's inability to work was the product of administrative or legal issues rather than alcohol use or abuse. (Id.)

## ERISA Standard of Review

"[I]n an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002), quoted in Curran v. Kemper Nat'l Servs., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (per curiam) (unpublished). "Hence, the 'standard' summary judgment considerations do not apply." Hert v. Prudential Ins. Co. of Am., 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009); see Hunley v. Hartford Life and Accident Ins. Co., ___ F. Supp. 2d ___, 2010 WL 1708718, at *5 (M.D. Fla. Apr. 26, 2010) (noting that "the typical standard of review for summary judgment motions does not apply in ERISA actions"); Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1273 (M.D. Fla. 2006) (finding it "difficult to ascertain how the 'normal' summary judgment rules can sensibly apply" when

reviewing an ERISA plan administrator's decision for reasonableness). The Eleventh Circuit has prescribed the following sequential standard of review in ERISA cases:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1195 (11th Cir. 2010) (citation omitted).

An ERISA plan administrator operates under a conflict of interest when it both determines eligibility for benefits and pays those benefits. Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008). If there is no conflict of interest and reasonable grounds support the administrator's decision, the court should "end the inquiry and affirm the decision." Capone, 592 F.3d at 1195. If there is a conflict, it should be considered in reassessing whether the decision was arbitrary and capricious; however, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008).

## Analysis

Defendant concluded that Plaintiff, following his discharge from Challenges, was not prevented from working by physical disease, injury, pregnancy, or mental disorder. Defendant

7

submits it is entitled to summary judgment because its decision was neither de novo wrong nor arbitrary and capricious. Plaintiff disagrees, emphasizing the medical records and correspondence indicating that Plaintiff could not return to work.

In its final decision, Defendant observed that: 1) Martineau did not report a substance abuse relapse and noted Plaintiff's frustration that he could not return to work; 2) Plaintiff traveled to South America to look at property while allegedly disabled; 3) PRN did not provide records documenting evaluations or treatment from August 25, 2004 through January 3, 2005; and 4) Plaintiff was no longer participating in PRN as of April 2005.[6] (R 86, 109) After discussing Dr. Gwinnell's and Dr. Beeson's opinions, Defendant found "insufficient evidence" of limitations or restrictions that prevented Plaintiff from returning to work after his discharge. (R 86-87)

Although several treatment providers indicated that Plaintiff was unable to work, there are only sparse references in the record to any functional limitations. In August 2004, before Plaintiff's discharge from Challenges, Dr. Rotondo opined that Plaintiff was limited by hyperactivity, insomnia, flight of ideas, depression, and chronic diarrhea. (R 377) Further indication of functional limitations, however, is notably absent from the evidence post-dating Plaintiff's discharge from Challenges. The only explanation for Dr. Friedman's conclusion that Plaintiff was unable to work was ongoing treatment and "a prolonged period in which his disease [wa]s active."[7] (R 288) Although Dr. Pomm confirmed Plaintiff's diagnoses of bipolar disorder and alcohol dependence,

---

[6] Defendant's final decision approved of these findings which were initially set forth in prior correspondence between Defendant and Plaintiff. (R 86, 109)

[7] Plaintiff speculates that Dr. Friedman declined to provide treatment records because they documented group therapy and might have implicated the privacy of other participants (Dkt. 41 at 14). This does not warrant an inference that Dr. Friedman's records sufficiently articulated Plaintiff's functional limitations.

he offered no explanation as to how these conditions limited Plaintiff's ability to work or why Plaintiff could not return to work until February 2007. (R 311) Indeed, Dr. Pomm's letter suggests that Plaintiff was unable to work because PRN withdrew him from practice.

The opinions indicating that Plaintiff was disabled after his discharge fail to explain how Plaintiff was restricted from performing the "essential tasks, functions and operations" of his occupation. Because these opinions were conclusory, Defendant did not err in discounting them. See, e.g., Gipson v. Admin. Comm. of Delta Air Lines, 350 F. App'x 389, 395 (11th Cir. 2009) (per curiam) (unpublished); Taylor v. Broadspire Servicing, Inc., 314 F. App'x 187, 192 (11th Cir. 2008) (per curiam) (unpublished) (pointing out that physician's "superficial and conclusory" records lacked "the kind of qualitative or quantitative medical information needed to determine [the claimant's] functional limitations on her ability to work"); Price v. Disability RMS, Civil Action No. 06-10251-GAO, 2008 WL 763255, at *18-20 (D. Mass. Mar. 21, 2008) (noting lack of evidence that physician's symptoms prevented performance of job duties).

Nor did Defendant err in relying on Dr. Gwinnell's and Dr. Beeson's assessments despite their role as consulting physicians. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Defendant's reliance on these assessments was further justified because the evidence indicating that Defendant was disabled due to physical or mental limitations is no more persuasive than the evidence indicating that Plaintiff was precluded from working by administrative or legal issues. See Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1572 (11th Cir. 1990)

("Even a self-interested [ERISA] fiduciary is entitled to choose an apparently more reliable source of information when sources conflict."). Because Defendant's denial of benefits was not de novo wrong, summary judgment should be granted in Defendant's favor.

Nonetheless, even assuming the denial of benefits was de novo wrong, Defendant would still be entitled to summary judgment. There is no dispute that Defendant was vested with discretion in deciding claims and operated under a conflict of interest. Despite that conflict, Defendant's decision was not arbitrary and capricious as the evidence indicating that Plaintiff was unable to work was conclusory and failed to discuss how alcohol dependence and/or bipolar disorder functionally limited Plaintiff. Indeed, Dr. Pomm's letter suggests that Plaintiff could have continued working in January 2005 had PRN not withdrawn Plaintiff from practice. After reviewing the file, Dr. Gwinnell and Dr. Beeson both pointed out the conclusory nature of the evidence indicating that Plaintiff could not work and concluded that Plaintiff's inability to work was a consequence of administrative or legal issues. Given the evidence available to Defendant, the decision to deny benefits, despite Defendant's conflict of interest, was not arbitrary and capricious.

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1)   Defendant's Motion for Summary Judgment (Dkt. 32) be **GRANTED**; and

(2)   Plaintiff's Dispositive Motion for Summary Judgment (Dkt. 47) be **DENIED**.

**Date:  July 27, 2010**

_____
ELIZABETH A JENKINS
United States Magistrate Judge

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. § 636(b)(1).

Copies to:
Counsel of Record
District Judge